## Richmond.

## COMMANDER V. PROVIDENT RELIEF ASSOCIATION.

### January 22, 1920.

1. APPEAL AND ERROR—*Successive Trials—Action in Appellate Court.*—In the instant case upon the first trial a verdict for plaintiff was set aside by the trial court as contrary to the law and the evidence. Plaintiff by bill of exceptions preserved the record and proceedings on that trial. Subsequently the case was again tried and the jury, upon a peremptory instruction from the court, rendered a verdict for defendant.

    *Held:* That under Code of 1904, section 3484, the Supreme Court of Appeals should look first to the evidence and proceedings upon the first trial, and if the court erred in setting aside the first verdict, the Supreme Court of Appeals must annul all proceedings subsequent thereto and enter judgment thereon.

2. APPEAL AND ERROR—*Conflicting Evidence.*—Conflicts in the evidence are for the jury and are not to be passed upon by the Supreme Court of Appeals.

3. MALICIOUS PROSECUTION—*Malice—Probable Cause—Questions for Jury.*—Malice and want of probable cause in actions for malicious prosecution are usually questions for the jury, and in the instant case there was evidence upon which the jury might have found the existence of both of these essential elements to the right of recovery.

4. MALICIOUS PROSECUTION—*Advice of Counsel—General Rule—Burden of Proof—Question for Jury.*—Advice of counsel, sought with an honest purpose of being informed as to the law, and procured upon a full, correct, and honest disclosure of all material facts within the knowledge of the party seeking such advice, or which should have been within his knowledge if he had made a reasonably careful investigation, constitutes a complete defense to an action for malicious prosecution; but the burden is on the defendant to prove that such advice was sought and obtained with the purpose and upon the disclosures here described, and whether such advice was thus sought and obtained is usually a question for the jury.

5. MALICIOUS PROSECUTION—*Advice of Counsel—Question for Jury.*—Attorney for defendant and the officers of defendant testified that there was a full disclosure to the attorney of all the facts and circumstances in connection with the alleged larceny; that he laid the same before the Commonwealth's attorney, and that thereupon both he and the Commonwealth's attorney advised defendant that the case was one for prosecution.

   *Held:* Notwithstanding this positive testimony, the defense based on advice of counsel was for the jury, where there were circumstances tending materially to show, not only a lack of good faith and honest purpose on the part of the defendant in seeking and acting upon the advice of counsel, but also to show failure to make the requisite disclosure.

6. MALICIOUS PROSECUTION—*Malice—Want of Probable Cause—Advice of Counsel.*—Want of probable cause. cannot be inferred from malice, but the ill will of the officials of the defendant in the instant case, coupled with their desire and threat to disarm the plaintiff as a competitor, were circumstances which the jury had the right to consider in determining whether the advice of counsel was sought in good faith and with an honest purpose to be informed as to the law, or merely as a sham and subterfuge.

7. MALICIOUS PROSECUTION—*Advice of Counsel—Full Disclosure of Facts.*—The disclosure required in order that the advice based upon it may constitute a shield against a suit for malicious prosecution must not only cover all the relevant facts within the knowledge of the prosecutor, but must include also material facts which would have been within his knowledge if he had made a reasonably careful investigation as to the guilt of the party accused.

8. MALICIOUS PROSECUTION—*Advice of Counsel—False Statements.*—Advice of counsel is no defense in an action for malicious prosecution, where some material statements made to counsel by defendant when seeking his advice were not true.

9. MALICIOUS PROSECUTION—*Advice of Counsel—Conflicting Evidence—Question for Jury.*—In the instant case the senior member of a law firm testified that he advised prosecution of plaintiff after a full disclosure to him of all the facts and circumstances in connection with the alleged larceny. It appeared from the evidence, however, that the junior member of the firm had made the following statement to a witness: "We told those people that if they went after him they were liable to ge soaked, but they did it anyhow." This statement the junior member denied having made.

   *Held:* That. it was for the jury to decide whether the statement was made and what it meant.

Error to a judgment of the Circuit Court of city of Norfolk, in an action of trespass on the case. Judgment for defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*J. E. Cole* and *Fred. C. Abbott*, for the plaintiff in error.

*S. L. Kelly* and *John J. Blake*, for the defendant in error.

KELLY, P., delivered the opinion of the court.

On the 14th day of October, 1914, the Provident Relief Association procured a warrant for the arrest of J. M. Commander charging him with the larceny of $72.96. He was arrested, imprisoned, until he could obtain bail, and was subsequently in due course indicted, tried and acquitted in the Corporation Court of the city of Norfolk. Thereupon he brought an action against the Provident Relief Association charging it with having instigated his arrest and prosecution maliciously and without probable cause.

[1] This action was tried and the jury rendered a verdict in favor of Commander for the sum of $3,500.00, which the trial court set aside as being contrary to the law and the evidence. The plaintiff by bill of exceptions preserved the record and proceedings on that trial. Subsequently the case was again tried, and the jury, upon a peremptory instruction from the court, rendered a verdict for the defendant. The plaintiff brings the case here for review.

Under the familiar statutory rule of practice, we must look first to the evidence and proceedings upon the first trial, and if we discover that the court erred in setting

58

aside the first verdict, we must annul all proceedings sub-
sequent thereto, and enter judgment thereon. (Code 1904,.
section 3484).

The evidence was conflicting, but in support of the ver--
dict it tended materially to establish the following facts:
The Provident Relief Association was an industrial in-
surance company and Commander had been in its em-
ployment for about fourteen years. Within a few months.
after entering the service of that company, he was made
superintendent of its Norfolk district. The business pros-
pered under his management and increased largely in
volume. He handled in the aggregate large sums of money
which were paid to him every week by the solicitors work-
ing under him. With the knowledge and acquiescence of
the executive officers he had always kept these funds in
his own name in a Norfolk bank, making weekly remit-
tances to the home office in Washington, D. C., and the
charge involved in this case was the only one of criminal
nature or semblance ever made against him.

Among the solicitors or collectors in Commander's district
was a man named R. B. Cornick. In February, 1911, this
man appeared to be delinquent in his accounts. About
that time the president of the company was in Norfolk
to attend a sort of booster meeting for the encouragement.
and stimulation of the local collectors. Cornick's accounts
were audited, his deficiency disclosed, and the president,
according to Commander's testimony, relieved him thereof,
charged it off, and gave him a "clean sheet." The evi-
dence on behalf of the company contradicts this latter
statement of Commander, but shows that deficiencies of
this kind were sometimes remitted, and the verdict of the
jury settled the conflict in favor of his version.

Cornick remained with the company until June, 1911,
when he was again in default, and Commander told him
that he could not work for the company any longer. Cor-

nick, thereupon, began to work with a similar and rival insurance company. Commander reported these conditions to his own company, and after consultation with the president, and upon the latter's instructions and advice, the matter was brought to the attention of the commissioner of insurance by the following letter addressed to Col. Joseph Button, Commissioner, at Richmond:

"Dear Sir:

"I hereby apply to have the license of R. B. Cornick revoked and charge that from his own account taken from his collecting book he was short in his account to the extent of $93.00; that he afterwards showed me between $3.00 and $4.00 additional. He claims an offset of about $10.00 on excess arrears.

(Signed) "J. M. COMMANDER, Supt., Norfolk.

"For the Provident Relief Association of
"Washington, D. C."

By direction of the president, a Richmond lawyer of known standing and ability was employed by Commander to appear before the Insurance Commissioner on behalf of the company. During the investigation, it developed that Cornick owed Commander, according to the latter's statement, on individual account certain sums which he had from time to time advanced on Cornick's account in settlements with the company. Commander was making no point of this alleged indebtedness to him before the Commissioner, but the latter decided that he would not permit a renewal of Cornick's license unless he settled with Commander for the advances above mentioned, as well as for the deficiency appearing on the books of the company. The amount which Commander agreed to accept in full

for the company was $90.00, being a few dollars short of the actual amount due; and the individual indebtedness claimed by Commander for advances on his account was $72.96. Cornick paid both amounts, and Commander gave him a receipt in the following form:

"July 21, 1911.

"Received of R. B. Cornick the sum of $162.96 in full settlement of his shortage to the Provident Relief Association and in full settlement of his personal indebtedness to J. M. Commander.

·(Signed) "J. M. COMMANDER,
"Supt. Provident Relief Association.

"This settlement is entirely satisfactory to me.

(Signed) "J. M. COMMANDER, Supt."

The foregoing receipt in the form as herein set out appears to have been given and submitted to the Insurance Commissioner to satisfy him that Cornick had complied with the Commissioner's requirements.

In September, 1911, Commander was in Washington, at the home office of the company, in connection with another matter, but, in the course of the conversation there he went over Cornick's affairs with the vice-president, and fully explained to him all about the settlement which he had made with Cornick, including the details of the hearing before the Insurance Commissioner.

Commander remained with the company for about three years longer. In the summer of 1914 some friction developed between him and the general officers of the company in Washington, and he was finally discharged in

October, 1914, under circumstances indicating a very de-
cided ill temper on the part of the president and vice-
president of the company. Up to about the month of
August, 1914, there seems never to have been any trouble
between Commander and the company, but about that time
the executive officers decided to make some changes in
the affairs of the company, and incidently desired to re-
duce the salary of Commander, not because of any alleged
inefficiency on his part, but presumably to save money for
the company. There is reason to infer that these officers
invited trouble with Commander and sought for some
grounds upon which to either reduce his pay or get rid
of him; and there was also evidence to the effect that the
defendant wished to discredit him for fear he might, after
his discharge, enter the service of some competing com-
pany and divert to it some of the defendant's business,
and that the vice-president said to him in that regard,
"Well, we will see that you don't do business any way,"
or words to that effect.

At the time of his discharge he had a substantial amount
of money in his hands belonging to the company, and
claimed that the company owed him a considerable sum
which should be credited upon that amount. In the settle-
ment of this matter, he was represented by Baker & Eg-
gleston, a law firm in Norfolk, and the company was repre-
sented by Jeffries & Jeffries of that city. At no time from
June, 1911, to the time of his arrest did the representa-
tives of the company ever intimate to him that they thought
he had taken money belonging to it. When the proposed
settlement of accounts had reached the point for an ex-
change of receipts, the company demanded a receipt in
full from him, but declined to give to him a like receipt.
He and his attorneys insisted upon an explanation for this
attitude on the part of the company, but none was forth-
coming. It developed afterwards that shortly before Com-

mander's discharge, the vice-president of the company had interviewed Cornick and had been informed by him that the receipt given by Commander in connection with the investigation before the Insurance Commissioner represented exclusively money which was due to the company, and that he did not owe Commander anything individually. Subsequently, Cornick gave the following affidavit, after an interview with the attorneys of the insurance company, to-wit: "This day personally appeared before me, the undersigned, a notary public in and for the city of Norfolk, State of Virginia, R. B. Cornick, who made oath that on the 21st day of July, 1911, he paid to J. M. Commander, agent for the Provident Relief Association, the sum of one hundred and sixty-two dollars and ninety-six cents ($162.96) in full settlement of his indebtedness to the Provident Relief Association. In the receipt which was given there is added these words: 'and in full settlement of his personal indebtedness to J. M. Commander.' Affiant here states that he was not indebted personally to J. M. Commander and that the whole sum of one hundred and sixty-two dollars and ninety-six cents ($162.96) was the balance due by him to the Provident Relief Association."

The conclusion which the company attempted to draw from this affidavit, and which Cornick's testimony as a witness in this case supports, is that the $72.96 collected from Cornick by Commander on individual account represented the February, 1911, deficiency with which Cornick was charged on the books at the home office. Commander denies this, and insists that the February, 1911, deficiency had been remitted and that the $72.96 represented an aggregate of smaller sums which from time to time he had advanced for Cornick to enable him to settle his weekly accounts. Cornick's statement is at variance with the receipt which he signed, and this variance is not satisfactorily explained by him. The circumstances strongly cor-

roborate Commander, and his version of the matter now is entirely consistent with what the attorney who represented the company before the Commissioner says Commander stated at that time as to Cornick's personal indebtedness to him.

Commander had not heard of the above mentioned affidavit, nor was the matter of his alleged larceny three years prior thereto mentioned to him in any way, until after his arrest. He made an explanation, substantially as above shown, which was satisfactory to the jury both in the criminal prosecution and in the trial of the instant case, and it is not too much to say that the jury in the latter case had the right to believe from the evidence that if the officers of the insurance company had been acting in perfect good faith, and with an honest desire to get at the true facts about his guilt or innocence, they would have sought his explanation, or at least given him an opportunity to explain before bringing about his arrest.

[2, 3] There was much testimony on the part of the defendant to controvert or explain the damaging features of the plaintiff's testimony as above set out. There was, however, to say the least of it, sufficient support for the plaintiff's version, and we are not to pass upon the conflicts in the evidence. Malice and want of probable cause in actions for malicious prosecution are usually questions for the jury, and in this case there was evidence upon which the jury might have found the existence of both of these essential elements to the right of recovery. The instructions of the court set out with entire fairness to defendant the propositions of law involved in the case, and the only question before us is whether the court erred in setting aside the verdict as contrary to the evidence.

Enough has been said to show that the verdict ought not to have been disturbed for lack of evidence on the part of the plaintiff to sustain it. It only remains to consider

whether the action of the trial court was warranted by the defendant's claim that in bringing about the arrest and prosecution of the plaintiff, it acted upon the advice of counsel. This is the ground upon which the court gave a peremptory instruction for defendant on the second trial, and is doubtless the one upon which the verdict on the first trial was set aside. It is also, as we understand counsel, the point chiefly relied upon for an affirmance of the judgment under review.

[4] It may be considered settled that advice of counsel sought with an honest purpose of being informed as to the law, and procured upon a full, correct and honest disclosure of all material facts within the knowledge of the party seeking such advice, or which should have been within his knowledge if he had made a reasonably careful investigation, constitutes a complete defense to an action for malicious prosecution; but the burden is on the defendant to prove that such advice was sought and obtained with the purpose and upon the disclosures here described, and whether such advice was thus sought and obtained is usually a question for the jury. 1 Cooley on Torts (3rd ed.) p. 333; Burks' Pl. & Pr. p. 237; *Evans* v. *Atlantic Coast Line Ry. Co.,* 105 Va. 72, 76, 80, 53 S. E. 3.

[5, 7] The senior member of the firm of Jeffries & Jeffries was principally in charge of the criminal branch of the litigation between Commander and the company. He and the officers of the company undertook to testify that there was a full disclosure to him of all the facts and circumstances in connection with the alleged larceny; that he laid the same before the Commonwealth's attorney, and that thereupon both he and the Commonwealth's attorney advised the company that the case was one for prosecution.

Notwithstanding this positive testimony, however, the facts of the case bring it within the general rule that the

defense based on advice of counsel is one which should be passed upon by the jury. There were circumstances tend-ing materially to show not only a lack of good faith and honest purpose on the part of the company in seeking and acting upon the advice of counsel, but also to show failure to make the requisite disclosure. Want of probable cause cannot be inferred from malice, but the ill will of the officials of the company coupled with their desire and threat to disarm the plaintiff as a competitor are circum-stances which the jury had the right to consider in de-termining whether the advice of counsel was sought in good faith and with an honest purpose to be informed as to the law, or merely as a sham and subterfuge, and as a part of a general scheme of severing his connection with the company in such a way as that he would not be able to take with him to some rival company any of the busi-ness which he had built up. Aside from this, however, the jury might well have found that the disclosure made to counsel did not measure up to the requirements of the law. There is a conflict of authority upon the question, but the rule in Virginia is that the disclosure required in order that the advice based upon it may constitute a shield against a suit for malicious prosecution must not only cover all the relevant facts within the knowledge of the prosecutor, but must include also material facts which would have been within his knowledge if he had made a reasonably careful investigation as to the guilt of the party accused. Burks' Pl. & Pr. p. 237; *Evans* v. *A. C. L. Ry. Co.*, 105 Va. 72, 80, 53 S. E. 3. It does not appear that the officers of the company inquired of the attorney who repre-sented them before the Insurance Commissioner, nor of the Commissioner himself, as to the statements at that time made by Commander. The jury thought, and we think, and perhaps counsel would have thought, that Comman-der's explanation of what took place before the Commis-

sioner was probably true. It is difficult to see how counsel of the learning and ability of the gentlemen who are said to have advised the criminal prosecution could have given such advice with full knowledge of the facts disclosed in the record before us, and yet, there appears no reason why the company could not at any time after September, 1911, have ascertained all the facts both for and against Commander's view of the case as fully as they were developed upon the trial.

[8, 9] Furthermore, the jury might very well have thought that some of the statements which the executive officers made to counsel were not true. For example, they told their counsel that Cornick owed a February, 1911, deficiency, and yet, Commander testified positively that this deficiency had been remitted and charged off, thus no longer constituting an indebtedness against Cornick. This was one of the important facts in the case, and if Commander is right, then the vice-president of the company, now the president, did not tell the truth to his counsel about this fact, nor to the jury on the stand. The jury accepted Commander's statement and rejetced the conflicting testimony, and we must do the same. In reaching this conclusion the jury was doubtless influenced by the further fact that Cornick had been taken back into the employment of the company, and had been with the company for some time before Commander was discharged, and neither Commander nor the representatives of the company at the home office had ever asked Cornick to account for the alleged February, 1911, deficiency. The jury may have been further influenced by the testimony of the Commonwealth's attorney, who said that although he advised the prosecution, he did so without having been told anything about the investigation before the Insurance Commissioner, and that he would have at least hesitated if he had known that the receipt given by Commander had

been executed as a result of a hearing before the Commissioner, and with the knowledge of counsel representing the company. Finally, and by no means least important, it appears in the evidence that the junior member of the firm of Jeffries & Jeffries, after the arrest of Commander, made the following statement to Mr. Eggleston, who had been counsel for Commander in the above mentioned settlement of accounts, but who was not counsel in the original prosecution, to-wit: "We told those people that if they went after him (Commander) they were liable to get soaked, but they did it anyhow." This testimony of Mr. Eggleston, after some controversy, finally went to the jury without objection. It is true that young Mr. Jeffries denied having made this statement, but admitted that he had a jocular conversation with Mr. Eggleston which the latter had misinterpreted, and in which he claimed to have simply said that he was not surprised at the suit, or something to that effect. The testimony of Mr. Eggleston, however, is direct and positive, and it was for the jury to decide what the conversation was and what it meant.

It has been urged upon us in the oral argument and in the brief that Mr. John L. Jeffries, the late lamented senior member of the firm of Jeffries & Jeffries, was an upright and distinguished lawyer, and a gentleman of veracity and integrity. This insistence is in accord with the view which the members of this court entertain of the character of Mr. Jeffries. This, however, does not take the case out of the general rule. He and his partner testified in the case, and, therefore, fall within the ordinary category of witnesses.

The law upon this branch of the case was stated to the jury by an instruction, which was certainly fair to the defendant because it omitted any reference to such facts as the defendant might upon reasonable enquiry have as-

certained, and which was not in conflict with the other and ample instructions of the court. The instruction referred to was as follows:

"The court instructs the jury that the burden of proof is upon the defendant to prove that he sought counsel with an honest purpose to be informed as to the law, and that he was in good faith guided by such advice in causing the arrest of the plaintiff, and that whether or not the defendant did, before instituting the criminal proceeding, make a full, correct and honest disclosure to his attorney or attorneys of all the material facts bearing upon the guilt of the plaintiff, of which he had knowledge, and whether, in commencing such proceedings, the defendant was acting in good faith upon the advice of his counsel, are questions of fact to be determined by the jury, from all the evidence and circumstances proved in the case. And if the jury believe from the evidence that the defendant did not make a full, correct and honest disclosure of all such facts to his counsel, but that he instituted criminal prosecution from a fixed determination of his own, rather than the opinion of counsel, then such advice can avail nothing in this suit."

The evidence in the case made it proper for the foregoing instruction to be given, and we think the verdict of the jury ought not to have been interferred with.

For the reasons stated we are of the opinion that the court erred in setting aside the verdict on the first trial, and we shall proceed, pursuant to the provisions of the statute, to enter an order in this court annulling all subsequent proceedings and entering up a judgment in favor of the plaintiff for the amount of the damages fixed by the verdict of the jury.

*Reversed.*